MASSILLON CITY SCHOOL DISTRICT BOARD OF EDUCATION ET AL.,
APPELLANTS AND CROSS-APPELLEES, *v.* CITY OF MASSILLON,
APPELLEE AND CROSS-APPELLANT, ET AL.

[Cite as *Massillon City School Dist. Bd. of Edn. v. Massillon,*
104 Ohio St.3d 518, 2004-Ohio-6775.]

(No. 2003–1851—Submitted September 29, 2004—Decided December 17, 2004.)

LUNDBERG STRATTON, J.

## I. Introduction

{¶ 1} R.C. 5709.62 permits certain municipal corporations to offer tax exemptions to businesses that agree to create or preserve employment opportunities in economically blighted areas called enterprise zones. R.C. 5709.82 requires these municipal corporations to share income tax revenue collected from "new employee[s]" with school districts located in the enterprise zone to compensate them for tax revenue they had to forgo due to the exemptions. The issues in this case involve the interpretation of the phrase "new employee" as found in R.C. 5709.82(A).

{¶ 2} There are two definitions of "new employee" under R.C. 5709.82(A)(1). The first is "[p]ersons employed in the construction of real property exempted from taxation." R.C. 5709.82(A)(1)(a) (construction workers). The second is persons "first employed at the site" of that real property and who have not had their income taxed by the municipal corporation in question within the past two years. R.C. 5709.82(A)(1)(b).

{¶ 3} The first question before us is *when* construction workers become "new employee[s]" under R.C. 5709.82(A)(1)(a). We hold that they become "new employee[s]" on the date that a municipal corporation's legislative authority formally approves the enterprise-zone agreement.

{¶ 4} The second question asks whether employees who are currently employed outside the municipal corporation's taxing authority, but are transferred to the enterprise zone, are "new employee[s]" under R.C. 5709.82(A)(1)(b) to the extent that they are "first employed at the site." We hold that they are.

## II. Enterprise-Zone Legislation

{¶ 5} Determining who is defined as a "new employee" within R.C. 5709.82(A) will affect whether, and in what amount, a municipal corporation will have to share income tax revenue collected from these employees with a school district that forgoes tax revenue due to the exemptions. In order to assist in this analysis, we must examine the statutory scheme that permits a municipal corporation to encourage economic development through the creation of enterprise zones.

{¶ 6} The legislative authority of a municipal corporation can designate a particular area as an "enterprise zone," which, generally speaking, is a geographical area that has suffered an economic downturn. R.C. 5709.62(A); see, generally, R.C. 5709.61(A)(1). Once an area is designated by a municipal corporation and certified by the Ohio Director of Development as having the required criteria under R.C. 5709.61(A), the municipal corporation's legislative authority can enter into agreements with qualified businesses whereby those businesses agree to create or preserve employment opportunities within the enterprise zone. R.C. 5709.62(C)(1). In return, the municipal corporation can provide a tax exemption for up to 15 years on the increase in value of the real property developed by the businesses. R.C. 5709.62(C)(1)(b).

{¶ 7} In order to compensate school districts for the tax revenue that they forgo because of these exemptions, the General Assembly enacted R.C. 5709.82, which requires a municipal corporation to share income tax revenue that it collects from new employees working in the enterprise zone with these affected school districts. R.C. 5709.82(D). However, the sharing is required only if the payroll of the new employees equals or exceeds $1 million. R.C. 5709.82(C)(2).

{¶ 8} If the threshold is reached, then the municipal corporation "shall attempt to negotiate an agreement" to compensate affected school districts for the tax revenue that they forgo because of the exemptions. R.C. 5709.82(C)(2). If negotiations are unsuccessful, then the municipal corporation must compensate the school districts pursuant to the formula in R.C. 5709.82(D). Id.

{¶ 9} Thus, the definition of a "new employee" is critical in two respects with regard to a municipal corporation's obligation to share income tax revenue with affected school districts. First, tax sharing is required only if the payroll of new employees meets or exceeds a $1 million threshold. R.C. 5709.82(D). Second, assuming that the threshold is met, the number of employees working in the enterprise zone who are defined as "new employee[s]" will determine the amount of income tax available to be shared if an agreement cannot be negotiated.

{¶ 10} In this case, appellants and cross-appellees, Massillon City School District Board of Education and Perry Local School District Board of Education ("school districts") filed a declaratory judgment action, alleging that appellee and cross-appellant, the city of Massillon ("city") failed to include on its payroll construction workers as "new employee[s]" as required by R.C. 5709.82(A)(1)(a). The school districts also alleged that the city failed to include on its payroll persons transferred to the enterprise zone and not taxed within the past two years by the city as new employees as required by R.C. 5709.82(A)(1)(b). Thus, the school districts alleged, the city undercompensated them. Specifically, the school districts alleged that construction workers become "new employee[s]" within the meaning of R.C. 5709.82(A)(1)(a) on the date that they begin to construct improvements on the real property. The school districts also alleged that the city should have considered persons who were transferred to work in the enterprise zone to be "new employee[s]" as defined in R.C. 5709.82(A)(1)(b).

{¶ 11} The city did not dispute that the construction workers were "new employee[s]" within R.C. 5709.82(A)(1)(a). Rather, the city argued that construction workers cannot be defined as "new employee[s]" until the exemption on real property commences, and the exemption does not commence until the calendar year after the county auditor assesses the value of the exempt property and enters it on the tax list. The city also argued that employees who are transferred to the enterprise zone are not "new employee[s]" within R.C. 5709.82(A)(1)(b) because they are not "first employed at the site."

{¶ 12} The trial court held that a construction worker becomes a "new employee" within the meaning of R.C. 5709.82(A)(1)(a) on the date that the municipal corporation approves the agreement that grants the exemption. The trial court also held that workers who are employed outside the municipal corporation's taxing authority but are transferred by their employer to work in

the enterprise zone and who have not been taxed by the municipal corporation within the past two years are "new employees" within R.C. 5709.82(A)(1)(b).

{¶ 13} The appellate court reversed the trial court's first holding and held that construction workers do not become "new employees" within R.C. 5709.82(A)(1)(a) until "the calendar year after the auditor notes the exemption on the tax duplicate." However, the appellate court affirmed that employees who are transferred to the enterprise zone and who have not been taxed by the municipal corporation within the past two years are "new employee[s]" within the meaning of R.C. 5709.82(A)(1)(b).

{¶ 14} The issue of when a construction worker becomes a "new employee" within R.C. 5709.82(A)(1)(a) is before this court pursuant to our acceptance of the school districts' discretionary appeal. The issue of whether a transferred employee is a "new employee" within R.C. 5709.82(A)(1)(b) is before this court pursuant to our acceptance of the city's cross-appeal.

{¶ 15} R.C. 5709.82 provides:

{¶ 16} "(A) As used in this section:

{¶ 17} "(1) *New employee*' means both of the following:

{¶ 18} "(a) *Persons employed in the construction* of real property exempted from taxation under the chapters or sections of the Revised Code enumerated in division (B) of this section;

{¶ 19} "(b) *Persons* not described by division (A)(1)(a) of this section who are *first employed at the site* of such property *and who within the two previous years have not been subject*, prior to being employed at that site, *to income taxation by the municipal corporation* within whose territory the site is located on income derived from employment for the person's current employer. 'New employee' does not include any person who replaces a person who is not a new employee under division (A)(1) of this section.

{¶ 20} "* * *

{¶ 21} "(C) * * *

{¶ 22} "If the legislative authority of any municipal corporation has acted under the authority of * * * [R.C.] 5709.62, * * * to grant or consent to the granting of an exemption from taxation for real or tangible personal property on or after July 1, 1994, the municipal corporation imposes a tax on incomes, and the *payroll of new employees resulting from the exercise of that authority equals or exceeds one million dollars in any tax year for which such property is exempted,* the legislative authority and the board of education of each city, local, or exempted village school district within the territory of which the exempted property is located shall attempt to negotiate an agreement providing for compensation to the school district for all or a portion of the tax revenue the

school district would have received had the property not been exempted from taxation.

{¶ 23} "If the legislative authority and board of education fail to negotiate an agreement that is mutually acceptable within six months of *formal approval by* the legislative authority of the instrument granting the exemption, *the legislative authority shall compensate the school district in the amount and manner prescribed by division (D) of* this section." (Emphasis added.)

### III. The School Districts' Appeal

{¶ 24} The appellate court determined that a construction worker does not become a "new employee" within the meaning of R.C. 5709.82(A)(1)(a) until the beginning of the calendar year after the auditor notes the real property exemption on the tax duplicate. The appellate court began its analysis by stating that a real property tax exemption is not effective until the calendar year after the exemption is listed by the auditor. Similarly, the court asserted that the value of real property does not change until the calendar year after the auditor marks an exemption on the tax duplicate. The court then recognized that the tax-sharing provisions in R.C. 5709.82(D) make reference to "calendar-year computations." The court held that "the exemption begins in the calendar year after the auditor notes the exemption on the tax duplicate." The court reasoned that "[t]o hold otherwise would create two disparate tax exemption periods, one for computing the tax savings to the property owners who are granted the exemption, and another different time period for computing the tax-sharing triggered by the exemption." We find that the appellate court's analysis is misplaced and conflicts with the purpose of R.C. 5709.82(A)(1)(a).

{¶ 25} We recognize that many construction projects begin shortly after execution of the enterprise-zone agreement and may be completed within a year. We also recognize that construction workers may make up the largest group of employees that come to work in the enterprise zone. Therefore, if the exemption does not commence until its value is reflected in the calendar year following its valuation, the majority of construction workers will never be defined as new employees because they are not working on "exempted" property.[1] This means that the payroll of construction workers will not count toward the $1 million threshold, which increases the likelihood that no tax revenue will ever be shared with the affected school districts.

---

1. The city argues that construction workers who remodel or build additions onto existing facilities after the property becomes exempt would be defined as new employees under R.C. 5709.82(A)(1)(a). We agree. However, the number of these employees is relatively small and will never approach the number of construction workers who are initially employed at the site to build or remodel existing facilities.

{¶ 26} The purpose of the tax-sharing requirement in R.C. 5709.82 is to compensate school districts for tax revenue that they forgo because of the tax exemptions granted by the municipal corporation. While an exemption may not be recognized or realized in the same calendar year in which R.C. 5709.82 requires the municipal corporation to share taxes with affected school districts, the fact remains that the school districts will suffer a loss of tax revenue when the exemption commences. Under the appellate court's interpretation, affected school districts will forgo this revenue without the benefit of the construction workers' payroll to count toward the $1 million threshold. In effect, the appellate court's interpretation reads construction workers out of the definition of R.C. 5709.82(A)(1), an interpretation that greatly reduces the chance that the tax-sharing threshold will be reached. This result cannot be what the General Assembly contemplated when it enacted R.C. 5709.82.

{¶ 27} We believe that the General Assembly was attempting to avoid such a problem as evidenced by language in several provisions of the Revised Code that address enterprise zones.

{¶ 28} R.C. 5709.61, the definitions section of the enterprise-zone legislation, states that a " '[n]ew employee' means a full-time employee first employed by an enterprise at a facility that is a project site *after the enterprise enters an agreement* under section 5709.62 or 5709.63 of the Revised Code." (Emphasis added.)

{¶ 29} Although this definition applies only to the provisions that pertain to the creation of enterprise zones, as opposed to the sharing requirements of R.C. 5709.82, it nevertheless sheds light on the General Assembly's definition of a new employee in an enterprise zone.

{¶ 30} R.C. 5709.82(C) provides:

{¶ 31} "If the legislative authority of any *municipal corporation has acted* under the authority of [R.C.] * * * 5709.62 * * * to *grant* or consent to the granting of an exemption from taxation * * *, the legislative authority and the board of education * * * shall attempt to negotiate an agreement providing for compensation to the school district * * *.

{¶ 32} "If the legislative authority and board of education fail to negotiate an agreement that is mutually acceptable within six months of *formal approval* by the legislative authority of the instrument *granting the exemption,* the legislative authority shall compensate the school district in the amount and manner pre-scribed by division (D) of this section." (Emphasis added.)

{¶ 33} Similar to R.C. 5709.61, this language also indicates that the exemption commences on the date of the agreement. This interpretation is the only one

that makes sense of the definition of "new employee" in R.C. 5709.82 for purposes of tax sharing.

{¶ 34} The city argues that under this interpretation, an affected school district could receive a windfall if the exemption is revoked. We find that argument to be meritless because taxes can be adjusted retroactively.

{¶ 35} Thus, we hold that the date that a municipal corporation formally approves the enterprise-zone agreement is the date on which the exemption effectively commences for the limited purpose of determining when a construction worker becomes a "new employee" under R.C. 5709.82(A)(1)(a). Accordingly, construction workers are "new employee[s]" within R.C. 5709.82(A)(1)(a) on the date that the municipal corporation formally approves the enterprise-zone agreement.

## IV. City's Cross–Appeal

{¶ 36} The city argues that employees who transferred from another location to the enterprise zone and have not been taxed by the municipal corporation are not new employees within the meaning of R.C. 5709.82(A)(1)(b) because they are not *newly hired* employees. The city argues that the phrase "first employed" in R.C. 5709.82(A)(1)(b) means only new hires. We disagree.

{¶ 37} A court must examine a statute in its entirety rather than focus on an isolated phrase to determine legislative intent. R.C. 1.42; *Commerce & Industry Ins. Co. v. Toledo* (1989), 45 Ohio St.3d 96, 102, 543 N.E.2d 1188. After examining R.C. 5709.82(A)(1)(b) in its entirety, we find, consistent with the school districts' argument, that this statute defines a "new employee" primarily by situs, not by employment status. Moreover, we find that to interpret "new employee" under R.C. 5709.82(A)(1)(b) to include only new hires would defeat the purpose of the tax sharing required by R.C. 5709.82.

{¶ 38} The definition of a "new employee" within R.C. 5709.82(A)(1)(b) essentially has two elements. The first is that the person must be "first employed at the site." This element is ambiguous. It could mean that the person must be *newly hired* at the site. Alternatively, it could also mean that the person is employed at *this* site *for the first time,* a requirement that would include persons who are transferred to the site.

{¶ 39} However, the second element can be reasonably interpreted only to mean that the person has not been taxed on his or her income by the municipal corporation sponsoring the enterprise zone.

{¶ 40} Both elements address the location of a person's employment in relation to the municipal corporation's taxing authority. Therefore, we interpret the phrase "first employed at the site" to mean not only new hires, but also persons

who are employed *at the site for the first time*, including persons who are transferred to the site from outside the municipal corporation's taxing authority.

{¶ 41} Moreover, the purpose of the tax sharing is to compensate school districts that have forgone tax revenue due to the exemptions granted by the municipal corporation. R.C. 5709.82(B)(1).

{¶ 42} Clearly, the municipal corporation will collect income taxes from all employees who are "new" to the site regardless of whether they are new hires or transferees from outside the municipal corporation's boundaries. To interpret the phrase "first employed at the site" to include only new hires means that a new source of tax revenue for the municipal corporation is not available to the affected school districts. Thus, interpreting R.C. 5709.82(A)(1)(b) to mean only new hires is inconsistent with the purpose of the tax-sharing requirements because that interpretation would not fully compensate school districts for taxes that they will forgo due to the exemption.

{¶ 43} Accordingly, we interpret the phrase "first employed at the site" in R.C. 5709.82(A)(1)(b) to include both employees who are newly hired at the site and employees who are employed at the site for the first time, including employees who are transferred to the site from outside the municipality corporation's taxing authority.

## V. Conclusion

{¶ 44} We hold that the date that a municipal corporation formally approves the enterprise-zone agreement is the date on which the exemption effectively commences for the limited purpose of determining when a construction worker is a "new employee" under R.C. 5709.82(A)(1)(a). We also hold that an employee who is transferred from outside a municipal corporation to work in the enterprise zone is a "new employee" within R.C. 5709.82(A)(1)(b) to the extent that the employee is "first employed at the site." Consequently, the payroll of these employees is included in the $1 million tax-sharing threshold set out in R.C. 5709.82(D).

{¶ 45} Accordingly, we affirm in part and reverse in part the judgment of the court of appeals and reinstate the judgment of the trial court.

Judgment affirmed in part
and reversed in part.

RESNICK, F.E. SWEENEY, PFEIFER, O'CONNOR and O'DONNELL, JJ., concur.

MOYER, C.J., concurs in judgment only.

Mary Jo Shannon Slick; Means, Bichimer, Burkholder & Baker Co., L.P.A., and Robert M. Morrow, for appellants and cross-appellees.

Black, McCuskey, Souers & Arbaugh, Bruce M. Soares, Randolph L. Snow, and Brian C. Cich, for appellee and cross-appellant.

Britton, Smith, Peters & Kalail, Karrie M. Kalail, John E. Britton, and Kathryn I. Brandt, urging affirmance in part for amicus curiae Ohio School Boards Association.

Barry M. Byron, Stephen L. Byron, and John Gotherman, urging affirmance in part and reversal in part for amicus curiae Ohio Municipal League.

HOLLON, APPELLEE, *v.* CLARY ET AL.; TWIN CITY FIRE INSURANCE COMPANY, APPELLANT.

[Cite as *Hollon v. Clary,* 104 Ohio St.3d 526, 2004-Ohio-6772.]

(No. 2003–2079—Submitted October 12, 2004—Decided December 17, 2004.)

O'CONNOR, J.

{¶ 1} Appellee, William Hollon, claims an entitlement to uninsured/underinsured motorist ("UM/UIM") insurance coverage under a policy of insurance with appellant, Twin City Fire Insurance Company ("Twin City"), his employer's liability insurer. Twin City denied Hollon's claim, alleging that American Ambulette and Ambulance Service, Inc. ("American"), Hollon's employer, had expressly rejected UM/UIM coverage. Hollon, however, asserts that American's rejection was ineffective because Twin City's written offer of UM/UIM coverage did not set forth the premiums for the coverage, as required by former R.C. 3937.18, Am.Sub.H.B. No. 261, 147 Ohio Laws, Part II, 2372 ("H.B. 261") and *Kemper v. Michigan Millers Mut. Ins. Co.*, 98 Ohio St.3d 162, 2002-Ohio-7101, 781 N.E.2d 196. Accordingly, Hollon asserts that coverage arose by operation of law, pursuant to *Gyori v. Johnston Coca–Cola Bottling Group, Inc.* (1996), 76 Ohio St.3d 565, 669 N.E.2d 824.

{¶ 2} Twin City acknowledges that its written offer did not set forth the premiums for UM/UIM coverage. Nonetheless, it maintains that American's rejection was valid because Twin City's written offer, in conjunction with extrinsic evidence, satisfied H.B. 261 and *Kemper*. This cause of action is before us pursuant to our acceptance of Twin City's discretionary appeal.

{¶ 3} Twin City offered UM/UIM coverage to American via two forms. Each form described the coverage and expressly stated the coverage limits; however, neither stated the applicable premiums. Kenneth Miller, American's co-owner, chose to reject UM/UIM coverage, signed the forms, and returned them to Twin City.

{¶ 4} During the relevant policy period of December 18, 1998, through December 18, 1999, Hollon was injured in two automobile accidents while he was employed as an ambulance driver for American. The first accident occurred on May 7, 1999, and involved a car driven by Tina Clary; the second accident occurred on October 15, 1999, and involved a car driven by David Robinson. Seeking compensation for his injuries, Hollon brought suit against Twin City, Clary, Robinson, and Guide One Insurance Company ("Guide One"), Hollon's personal UM/UIM insurance carrier.

{¶ 5} The claims against Robinson were dismissed after his insurer settled with Hollon. Guide One moved for partial summary judgment, and Twin City moved for summary judgment, attaching an affidavit by Miller, in which he averred the following:

{¶ 6} "Before approving and signing these rejection forms, I was informed, aware, and understood: (a) that UM/UIM coverage was available; (b) the amount of the premium that would be charged for UM/UIM coverage if I selected UM/UIM coverage, or of the reduced premium if I selected reduced UM/UIM

limits; (c) what UM/UIM coverage was; and (d) that I was rejecting UM/UIM coverage in its entirety."

{¶ 7} The trial court denied Guide One's motion and granted Twin City's motion. The court found that American had "expressly and knowingly" rejected UM/UIM coverage and, therefore, Twin City had no obligation to indemnify Hollon. Subsequently, Hollon dismissed the claims against Guide One, presumably after it had paid Hollon his policy limit.

{¶ 8} Hollon appealed from the court's judgment granting summary judgment to Twin City. The Court of Appeals for Montgomery County determined that a rejection of UM/UIM is not valid if the insurer's written offer does not state the premium to be charged, even when there is extrinsic evidence showing that the insured was aware of the premium. Accordingly, it held that American's rejection failed, and Hollon was entitled to UM/UIM coverage as a matter of law.

{¶ 9} In *Linko v. Indemn. Ins. Co. of N. Am.* (2000), 90 Ohio St.3d 445, 739 N.E.2d 338, we held that in order to have a valid rejection of an offer of coverage under the Am.Sub.S.B. No. 20 version of R.C. 3937.18, 145 Ohio Laws, Part I, 204, 210 ("S.B. 20"), the offer must set forth in writing "a brief description of the coverage, the premium for that coverage, and an express statement of the UM/UIM coverage limits." Id. at 449, 739 N.E.2d 338. After our ruling in *Linko*, R.C. 3937.18 was amended by H.B. 261, which governs the offer and rejection of insurance at issue here. Although "R.C. 3937.18, as amended by H.B. 261, unlike the [S.B. 20 version], speaks directly to the requirements that are necessary for a valid offer and rejection of UM/UIM coverage," *Kemper*, 98 Ohio St.3d 162, 2002-Ohio-7101, 781 N.E.2d 196, at ¶ 6 (Moyer, C.J., dissenting), *Kemper* held that *Linko*'s requirements are also applicable to the H.B. 261 version. *Kemper* at ¶ 2. Thus, under *Kemper*, a rejection of an offer that fails to satisfy the *Linko* requirements is invalid, and UM/UIM coverage arises by operation of law. See *Gyori*, 76 Ohio St.3d 565, 669 N.E.2d 824.

{¶ 10} In *Kemper*, we answered, without explanation, two questions certified to us by the United States District Court for the Northern District of Ohio, Western Division. Our response to the first question indicates that *Linko*'s requirements are applicable to insurance policies written while the H.B. 261 version of R.C. 3937.18 was in effect. The second question asked: "If the *Linko* requirements are applicable, does, under HB 261, a signed rejection act as an effective declination of UM/UIM coverage, where there is no other evidence, oral or documentary, of an offer of coverage?" See *Kemper* at ¶ 3. We answered in the negative. From our answer to the second question, Twin City has inferred that compliance with R.C. 3937.18 may be demonstrated by "other evidence," such as Miller's affidavit.

{¶ 11} Preliminarily, we note that this is an issue of contract formation, not of contract interpretation. The terms of the insurance contract between Twin City and American are clear and do not include UM/UIM coverage. We must determine only whether the record demonstrates that a valid offer of UM/UIM insurance was made.

{¶ 12} The H.B. 261 version of R.C. 3937.18(C) differs from the H.B. 20 version interpreted in *Linko* by providing that a signed rejection of coverage creates the presumption that a valid offer of coverage has been made. It read: "A named insured's or applicant's written, signed rejection of both coverages as offered under division (A) of this section, or a named insured's or applicant's written, signed selection of such coverages in accordance with the schedule of limits approved by the superintendent, shall be effective on the day signed, shall create a presumption of an offer of coverages consistent with division (A) of this section, and shall be binding on all other named insureds, insureds, or applicants." Because the General Assembly amended the statute to create the presumption of a valid offer when an insured signs a rejection of coverage, *Linko*'s requirements are arguably less relevant to the H.B. 261 version of R.C. 3937.18 than they are to the S.B. 20 version, the statute that *Linko* addressed. Nonetheless, in *Kemper* we held that *Linko* applies to H.B. 261. But we left unanswered how it applies.

{¶ 13} The *Linko* requirements are a means to an end. They were chosen to ensure that insurers make meaningful offers. A "meaningful offer" is "an offer that is an offer in substance and not just in name" that "allow[s] an insured to make an express, knowing rejection of [UM/UIM] coverage." *Linko*, 90 Ohio St.3d at 449, 739 N.E.2d 338. Though Twin City's written offer, per se, did not satisfy all the *Linko* requirements, we will not elevate form over substance or ignore the expressed intent of the parties to a contract. Unequivocally, American expressed that it did not wish to purchase UM/UIM coverage. Twin City's written offer of UM/UIM coverage, in conjunction with Miller's unrebutted affidavit, demonstrates that American's rejection was made after having received a brief description of coverage, an express statement of UM/UIM coverage limits, and the applicable premiums. We are, therefore, certain that American made an express, knowing rejection of UM/UIM coverage, and under H.B. 261, we can presume that a valid offer had been made.

{¶ 14} Accordingly, we hold that a signed, written rejection of UM/UIM coverage is valid under the H.B. 261 version of R.C. 3937.18 if it was made in response to an offer that included a brief description of the coverage and the coverage premiums and limits. Once a signed rejection is produced, the elements of the offer may be demonstrated by extrinsic evidence.

Judgment reversed.

Moyer, C.J., Lundberg Stratton and O'Donnell, JJ., concur.

Resnick, J., dissents.

F.E. Sweeney and Pfeifer, JJ., would dismiss the appeal as having been improvidently allowed.

———————

Dyer, Garofalo, Mann & Schultz and Kenneth J. Ignozzi, for appellee.

Freund, Freeze & Arnold, Stephen V. Freeze and Jamey T. Pregon, for appellant.

Ulmer & Berne, L.L.P., and David L. Lester, urging reversal for amicus curiae KeyCorp.

Davis Young and Richard M. Garner, urging reversal for amicus curiae Progressive Preferred Insurance Company.

A. Mark Segreti Jr., urging affirmance for amici curiae Terence D. McLean and Carol M. McLean.