OPINION *Page 2 
{¶ 1} Plaintiff-appellant Thomas Peters appeals the decision of the Harrison County Common Pleas Court which granted summary judgment in favor of defendant-appellee Liberty Mutual Fire Insurance Company. The threshold issue on appeal is whether Liberty Mutual presented appellant's employer with a meaningful offer from which that employer could knowingly reject uninsured motorist's coverage where no recent premiums had been disclosed to the employer. We hold that the offer of coverage was sufficient, and thus, the rejection was valid. As such, the trial court's decision is affirmed as uninsured motorist's coverage did not arise by operation of law.
 STATEMENT OF THE CASE {¶ 2} On January 9, 2002, appellant was working for Pike Electric, Inc. He was repairing lights on a trailer attached to a Pike truck which was parked on the side of the road. His co-workers began raising a live electric line onto a utility pole above the trailer. Out of safety concerns, appellant stopped his repair work and moved to the side of the Pike truck. At that time, a vehicle owned by former defendant Douglas Grim and driven by defendant Pamela Tipton struck appellant pinning him against the Pike truck.
 {¶ 3} The Pike truck was covered by a business auto policy issued on August 1, 2001 by Liberty Mutual. Appellant was also issued a company vehicle, which was insured under this policy. The policy had three million dollars worth of bodily injury liability coverage with a $500,000 deductible. Pike rejected uninsured/underinsured motorist (hereinafter collectively referred to as UM) coverage.
 {¶ 4} On January 12, 2004, appellant filed a complaint against Tipton, Grim, Pike, and Liberty Mutual. Motions for summary judgment were filed. Originally, on November 16, 2004, the trial court held that a valid offer and rejection of UM coverage was not established by the four corners of the insurance policy and that under Seventh District precedent, it could not view extrinsic evidence on the matter. SeeBranch v. Lapushansky, 153 Ohio App.3d 170, 2003-Ohio-3465 (however, this case analyzed a version of the statute existing prior to the various amendments relevant herein). The trial court granted summary judgment to appellant, holding that UM coverage arose by operation of law on the Pike policy pursuant to R.C. 3937.18. However, the court granted partial summary judgment to Liberty Mutual on the grounds that the policy provided a $500,000 deductible for UM coverage that arose by operation of law. *Page 3 
 {¶ 5} New summary judgment motions were permitted after Liberty Mutual cited a new Supreme Court case holding that the writing requirements for the offer of UM coverage had been relaxed by the statutory amendments applicable to the case at bar. See Hollon v. Clary, 104 Ohio St.3d 526,2004-Ohio-6772 (noting that a signed rejection allows one to presume a valid offer was made, which if rebutted, can be confirmed by extrinsic evidence). Cf. Linko v. Indemnity Ins. Co. of N.Am. (2000),90 Ohio St.3d 445 (interpreting a prior statute, disallowing extrinsic evidence of an offer, and thus, requiring the written offer to expressly contain a brief description of the coverage, the premium and the limits). As an alternative ground for summary judgment, Liberty Mutual added an argument that appellant did not qualify as an insured under the Pike policy. Appellant responded and sought reconsideration of the decision regarding the application of a deductible to UM coverage that arose by operation of law.
 {¶ 6} On March 5, 2007, the trial court issued a decision granting full summary judgment to Liberty Mutual. The court noted that a valid offer and rejection need no longer be established on the face of the rejection form. The court concluded that Pike made a knowing and valid rejection of UM coverage and thus UM coverage did not arise by operation of law. The court alternatively stated that even if UM coverage arose by operation of law, appellant did not qualify as an insured under the definition of insured contained in the liability section of the policy. The court also concluded that even if appellant were an insured and even if UM coverage arose by operation of law, any UM coverage would be subject to a $500,000 deductible.
 {¶ 7} After dismissing the remaining parties, appellant filed notice of appeal from the trial court's grant of summary judgment in favor of Liberty Mutual. See Denham v. New Carlisle (1999), 86 Ohio St.3d 594,596-597 (decision becomes final when appellant dismisses the claims against the remaining parties).[1]
 SUMMARY JUDGMENT {¶ 8} Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of *Page 4 
evidence and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). Thus, even if there is shown to be some genuine issue of fact, if that issue is not dispositive due to the lack of a genuine issue on a threshold legal matter, summary judgment is still appropriate. See, e.g., Russell v. Interim Personnel, Inc. (1999), 135 Ohio App.3d 301,304 (a fact is material when it affects the outcome of the suit under the applicable substantive law).
 {¶ 9} Summary judgment can be rendered if, after construing the evidence in a light most favorable to the non-movant on the material facts, it appears that reasonable minds can only come to a conclusion adverse to the non-movant. Civ.R. 56(C). We review the propriety of granting summary judgment de novo. See Comer v. Risko,106 Ohio St.3d 185, 2005-Ohio-4559, ¶ 8. As such, pure legal issues on certain undisputed factual matters are properly addressed by use of summary judgment. Here, we are presented with various legal issues affecting the field of UM coverage and the interpretation of an insurance contract.
 {¶ 10} If the terms of an insurance policy are unambiguous, the interpretation of the policy is a matter of law that is reviewed de novo on appeal. Dorsey v. Federal Ins. Co., 154 Ohio App.3d 568,2003-Ohio-5144, ¶ 12 (7th Dist.). As with all contracts, we look to the plain language to determine the parties' intent regarding coverage. Id. Typically, if the terms of the policy are reasonably susceptible to more than one interpretation, they are construed strictly against the insurer. Id., citing Lane v. Grange Mut. Cos. (1989), 45 Ohio St.3d 63,65. However, in cases such as this, the terms are construed in favor of the policyholder-employer, not the claimant-employee. Galatis v.Westfield, 100 Ohio St.3d 216, 2003-Ohio-5849, ¶ 35.
 ASSIGNMENT OF ERROR {¶ 11} Appellant's sole assignment of error provides:
 {¶ 12} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT, THOMAS D. PETERS, IN GRANTING SUMMARY JUDGMENT IN FAVOR OF APPELLEE, LIBERTY MUTUAL INSURANCE COMPANY, ON APPELLANT'S ASSERTED UNINSURED MOTORIST CLAIM AGAINST LIBERTY MUTUAL BUSINESS AUTO POLICY * * *."
 {¶ 13} Currently, Ohio does not require mandatory offering of UM coverage or imposition of UM coverage by operation of law. See S.B. 97 version of R.C. 3937.18 *Page 5 
(eff. Oct. 31, 2001). However, the policy in this case was issued on August 1, 2001. Thus, this case is governed by the S.B. 267 version of former R.C. 3937.18.
 {¶ 14} Pursuant to S.B. 267, an automobile liability policy cannot be delivered or issued for delivery unless UM is offered to the insured. R.C. 3937.18(A). The insured can reject UM coverage in a signed writing. R.C. 3937.18(C). A named insured's signed rejection of the offered coverage shall be effective on the day signed, shall create a presumption of an offer of coverages consistent with division (A) and shall be binding on all other named insureds, insureds or applicants. Id. If the offer and rejection are lacking, then UM coverage arises by operation of law. Abate v. Pioneer Mut. Cas. Co. (1970),22 Ohio St.2d 161, 163. However, unless the insured requests it in writing, UM coverage need not be offered in a renewal policy that provides continuing coverage where the insured rejected such coverage in a prior policy. R.C. 3937.18(C).
 {¶ 15} Initially we note that although Pike had generally been insured by Liberty Mutual since 1987, there was a three-year period just prior to the August 1, 2001 policy period at issue where Pike utilized a different insurer. Thus, the policy at issue is not a renewal policy for purposes of the exception contained in R.C. 3937.18(C).
 {¶ 16} We next address appellant's suggestion that there is a genuine issue of material fact as to whether Liberty Mutual received the signed rejection form prior to the commencement of the policy period and whether Pike's Secretary-Treasurer may have backdated the form. The rejection form purports to have been signed on July 25, 2001, which is prior to the commencement of the August 1, 2001 policy period. Pike's Secretary-Treasurer confirmed in his affidavit and in his deposition that he signed the rejection on July 25, 2001. To dispute this date, appellant points to the deposition of Liberty Mutual's underwriter, who identified a letter to Pike's Secretary-Treasurer from a Liberty Mutual employee. The letter was dated August 9, 2001 and asked a Pike representative to sign the enclosed rejection forms and to use July 31, 2001 as the date. Pike's Secretary-Treasurer added a handwritten response to the face of the letter stating that all forms were signed as requested. (Enright Depo. at 42-45 and Exhibit 14).
 {¶ 17} Contrary to appellant's suggestion, the letter does not conclusively establish that a Pike representative had not already signed a rejection; rather, it shows merely that one employee at Liberty Mutual had not yet received the rejection. Still, *Page 6 
viewing the evidence in the light most favorable to appellant, one could find that there is a genuine issue as to whether the signed rejection was received by Liberty Mutual before the beginning of the policy period and whether the rejection form was signed before the commencement of the policy period at issue. However, not all issues of fact are material. The next logical question is whether the rejection form must be signed by the insured and received by the insurer prior to the policy period to be statutorily valid in a case where it was signed and submitted prior to the accident.
 {¶ 18} The Supreme Court once held that "in order for a rejection of UM coverage to be expressly and knowingly made, such rejection must be in writing and must be received by the insurance company prior to thecommencement of the policy year." Gyori v. Johnston Coco-Cola BottlingCo. (1996), 76 Ohio St.3d 565, 569. However, that case had an unusual factual situation where the employer's rejection was signed two months after the policy period commenced and one month after the accident. Id. at 568-569. The Court noted that to allow rejection after theaccident would invite fraud and misrepresentation by corporate officers. Id. at 569.
 {¶ 19} Here, the rejection was signed and returned at the latest within days of the commencement of the policy period and monthsprior to the January 2002 accident, unlike the facts in Gyori. See Enright Depo. Exhibit 14 (showing receipt in August 2001) and Exhibit 15 (a November 2001 e-mail showing underwriter possessed Pike's rejection forms to send on to other department). Thus, the facts here are distinguishable from those in Gyori. Regardless, Gyori interpreted the S.B. 20 version of R.C. 3937.18. After Gyori, the legislature enacted the H.B. 261 version of R.C. 3937.18. The following changes are pertinent here:
 {¶ 20} "A named insured's or applicant's written, signed rejection * * * shall be effective on the day signed, shall create a presumption of an offer of coverages * * *, and shall be binding on all other named insureds, insureds, or applicants." R.C. 3937.18(C) (emphasis added).
 {¶ 21} These additions remained in the S.B. 267 version, which is at issue in this case. Since the rejection is effective on the day signed for policies issued after September 3, 1997, the 1996 Gyori holding that the rejection must be received prior to the commencement of the policy period is no longer valid for such policies. There is plenty of case law in support of this conclusion. (We note that in reviewing cases *Page 7 
mentioning Gyori, it is important to determine whether the case is evaluating a policy which pre-dates or post-dates H.B. 261.)
 {¶ 22} The Third District has opined that H.B. 261's changes rejectedGyori's holding that the parties are precluded from executing mid-term rejections. Turek v. Vaughn, 154 Ohio App.3d 612, 2003-Ohio-4473, ¶42-43 (but utilizing Gyori in that case due to application of pre-1997 amendment S.B. 20 version to the policy at issue). The Second District and Sixth District have also opined that 1997 H.B. 261 discarded theGyori rule that rejections must occur prior to the beginning of the policy year. Shindollar v. Erie Ins. Co., 148 Ohio App.3d 547,2002-Ohio-2971, ¶ 9-11 (Second District so stating in dicta);Raymond v. Sentry Ins., 6th Dist. No. L-01-1357, 2002-Ohio-1228 ("The General Assembly deleted the Gyori requirement that the coverage rejection must come prior to the effective date of the policy.")
 {¶ 23} The First, Fourth and Ninth Districts have also agreed that the 1997 amendments to R.C. 3937.18(C) were passed in response to the decision in Gyori. Hall v. Kemper Ins. Co., 4th Dist. No. 02CA17,2003-Ohio-5457, ¶ 89 (policy issued July 1, 1998, rejection signed October 27, 1998 and accident occurred April 7, 1999) citingMartinez v. Travelers Ins. Co., 9th Dist. No. 20796, 2002-Ohio-1979 andRoper v. State Auto. Mut. Ins. Co., 1st Dist. No. C-010117, 2002-Ohio-3283, at ¶ 26. See, also, Johnston v. Wayne Mut. Ins.Co., 4th Dist. No. 02CA3, 2002-Ohio-6157, ¶ 42-44. "The statute clearly and explicitly `rejected the requirement that the offer and rejection be made prior to the effective date of the policy'." Hall, 4th Dist. No. 02CA17 at ¶ 89, quoting Roper, 1st Dist. No. C-010117 at ¶ 26.
 {¶ 24} Finally, we note that the latest Supreme Court case reviewing the requirements for a valid offer and rejection does not mention any need for the rejection to be provided prior to the policy period but rather merely cites the language of R.C. 3937.18(C), "shall be effective on the day signed [and] shall create a presumption of an offer * * *."Hollon v. Clary, 104 Ohio St.3d 526, 2004-Ohio-6772, ¶ 12.
 {¶ 25} We conclude that under the relevant version of R.C. 3937.18, the rejection can validly be made and returned after the policy period commences as a rejection is effective on the date signed. Here, even assuming there is an issue of fact as to whether the rejection forms were signed and returned to Liberty Mutual prior to the commencement of the policy period on August 1, 2001, appellant's own submissions from Liberty's underwriting files establish that the forms were returned *Page 8 
prior to the January 9, 2002 accident. This is a timely rejection under R.C. 3937.18(C). Thus, we move to the next issue regarding whether the offer was sufficient to result in a valid rejection or whether the offer and rejection were insufficient causing UM coverage to arise by operation of law.
 {¶ 26} In order to realize the extent of the current requirements of an offer and rejection, it is prudent to review the background law and the specific refinements made over the years. In Linko, the Supreme Court held that for a valid rejection of UM coverage under S.B. 20 (the pre-1997 amendment version of R.C. 3937.18), the offer had to state the following in writing: (1) a brief description of the coverage, (2) the premium for the coverage, and (3) a statement of the coverage limits.Linko v. Indem. Ins. Co. of N.Am. (2000), 90 Ohio St.3d 445, 449. Thus, the Court required both a written rejection and a written offer for policies issued before H.B. 261 and prohibited the consideration of extrinsic evidence to prove that the waiver of UM coverage was knowingly made. Id. at 450. Notably, the 1997 amendment in H.B. 261 was not at issue in Linko. Id. at 445 (dealing with a 1996 accident).
 {¶ 27} The relevant portion of said amendment provides that: "A named insured's or applicant's written, signed rejection of both coverages * * * shall create a presumption of an offer of coverages * * * and shall be binding on all other named insureds, insureds, or applicants." R.C.3937.18(C) (emphasis added). After this amendment, the Supreme Court had occasion to state that the Linko requirements were applicable post-H.B. 261, but the Court left open the question of whether extrinsic evidence of the offer was permissible and how Linko applied. Kemper v. MichiganMillers Mut. Ins. Co., 98 Ohio St.3d 162, 2002-Ohio-7101, ¶ 2-3. ThisKemper decision contained no explanation and was merely a brief response to a federally certified question.
 {¶ 28} The Court later clarified/amended its position in Hollon v.Clary, 104 Ohio St.3d 526, 2004-Ohio-6772, ¶ 9-14. In Hollon, the plaintiffs employer had expressly rejected UM coverage, but the plaintiff claimed that the rejection was ineffective because the insurer's written offer of coverage did not state the premiums for the coverage. Id. at ¶ 1. The insurer argued that the employer's rejection was valid because the written offer combined with extrinsic evidence satisfied Linko, Kemper and H.B. 261. Id. at ¶ 2. The affidavit of the employer's representative stated that before signing the rejection form, he was informed of, aware of and understood: that *Page 9 
UM coverage was available; what the coverage entailed; that he was entirely rejecting UM coverage; and, the amount of the premium if UM coverage was selected or the amount of the reduced premium if reduced limits were chosen. Id. at ¶ 6.
 {¶ 29} The Hollon Court pointed out that after H.B. 261, a signed rejection creates the presumption that a valid offer of coverage has been made. Id. at ¶ 12. The Court thus opined that the Linko
requirements are arguably less relevant to H.B. 261 policies than they were to the Linko S.B. 20 policy. Id. The Hollon Court held:
 {¶ 30} "The Linko requirements are a means to an end. They were chosen to ensure that insurers make meaningful offers. A `meaningful offer' is `an offer that is an offer in substance and not just in name' that `allow[s] an insured to make an express, knowing rejection of [UM/UIM] coverage.' Linko, 90 Ohio St.3d at 449, 739 N.E.2d 338. Though [the insurer's] written offer, per se, did not satisfy all the Linko
requirements, we will not elevate form over substance or ignore the expressed intent of the parties to a contract. Unequivocally, [the employer] expressed that it did not wish to purchase UM/UIM coverage. [The insurer's] written offer of UM/UIM coverage, in conjunction with [the] unrebutted affidavit, demonstrates that [the employer's] rejection was made after having received a brief description of coverage, an express statement of UM/UIM coverage limits, and the applicable premiums. We are, therefore, certain that [the employer] made an express, knowing rejection of UM/UIM coverage, and under H.B. 261, we can presume that a valid offer had been made.
 {¶ 31} "Accordingly, we hold that a signed, written rejection of UM/UIM coverage is valid under the H.B. 261 version of R.C. 3937.18 if it was made in response to an offer that included a brief description of the coverage and the coverage premiums and limits. Once a signed rejection is produced, the elements of the offer may be demonstrated by extrinsic evidence." Id. at ¶ 13-14.
 {¶ 32} Based upon this case, the trial court in the case at bar found that Pike's rejection was valid. It is undisputed that the written offer (the rejection form) here contained a sufficient description of the coverage, which need only be brief. See Hollon, 104 Ohio St.3d 525
at ¶ 14. It is the remaining two elements of an offer, the coverage limit and the premium, that are now at issue.
 {¶ 33} The Liberty Mutual offer/rejection form had blanks for premiums for various levels of coverage. However, none of the blanks were filled with a premium amount. Under the pre-1997 amendment version of the statute, UM coverage would *Page 10 
have arisen by operation of law by merely viewing the offer. Now, however, the signed, written rejection allows us to presume a valid offer was made. R.C. 3937.17(C) (versions existing between 1997 amendment and 2001 amendment). And, if the plaintiff rebuts the presumption of a valid offer, extrinsic evidence can be used to establish the elements of the offer (description of coverage, premium and limits). Hollon, 104 Ohio St.3d 536 at ¶ 12-14. We are thus left to consider the extrinsic evidence on the coverage limit and the premium elements to ensure a valid rejection.
 {¶ 34} The coverage limit of three million dollars and the ability to choose lesser coverage limits was disclosed to Pike. The written offer (rejection form) specified that Ohio law requires we provide you with UM coverage at a limit of liability equal to the policy's bodily injury liability limit. Although the bodily injury limit is not thereafter shown (because the three million dollar limit was higher than the preprinted limits in the form), extrinsic evidence established that Pike was fully aware of the fact that they had three millions dollars worth of liability coverage. This was the amount provided in the actual insurance contract itself. Furthermore, this was the amount specified by Pike as desired in seeking bids on primary policies. As such, the coverage limit element is satisfied. Thus, the remaining element to consider is the premium for the offered UM coverage.
 {¶ 35} Internal documents from Liberty Mutual's underwriting file advised that an exhibit with a list of premiums for various UM coverages would be provided to Pike (actually to Pike's insurance consulting firm used to conduct its commercial insurance bidding around the nation) during the bidding process so that an accurate total quote could be provided. (Enright Depo. 18). Pike's Secretary-Treasurer stated that the rejection form was the only communication he received regarding the Ohio UM coverage, and as aforementioned, the rejection form (written offer) signed by Pike did not state any premiums for UM coverage. Pike's Secretary-Treasurer, who signed the rejection form, admitted that he was not informed at the time of the offer what the exact premium for three million dollars worth of UM coverage would be for this particular year. (Banner Depo. 24-25).
 {¶ 36} Still, he stated that he worked at Pike for more than thirty years and that Pike had been insured by Liberty Mutual since 1987, with the exception of the three-year period just prior to the policy at issue. He noted that the bidding process was for the purchase of insurance for seventeen or eighteen states and explained that they *Page 11 
reject UM coverage every year in all states possible. (Banner Depo. 19). When asked about the circumstances under which UM coverage could be accepted or rejected in Ohio, he responded, "We didn't really delve into each of these states and that sort of thing because I've rejected this forever." (Banner Depo.21). He could not recall what the conversations specifically entailed during the bidding process, but he did disclose:
 {¶ 37} "* * * when it comes to electing uninsured or underinsured motorist coverage that has not been something that we spend a lot of time on. We talked about that years ago and decided that for any of the premium that we — the high deductible we had, we just elect out of this coverage and we just do it every time." (Banner Depo. 22).
 {¶ 38} "* * * over the years we had discussed a premium versus the coverage and we had decided some years ago that we didn't think it was worth it, so this year there was no specific talk about what the premium would be.
 {¶ 39} "We had always just assumed that we did not — we did not want the coverage. We did not think it was worth it for what we paid for it with our exposure that we would have with such a high [half million dollar] deductible as we carry." (Banner Depo. 25).
 {¶ 40} He later added that in estimating costs, he considered any potential UM losses to the company as falling under half a million dollars, the amount of the desired deductible. (Banner Depo. 43). Essentially, he opined that regardless of the exact 2001 premium, with a half million dollar deductible, UM coverage would be pointless because UM losses to the company are extremely unlikely to exceed the deductible.
 {¶ 41} The Hollon Court advised us to avoid elevating form over substance and to heed the expressed intent of the parties, i.e. the insurer and the employer. Hollon, 104 Ohio St.3d 526 at ¶ 13. The employer here expressly stated that it wished to decline UM coverage. This was part of the employer's explicit demands in seeking bids from insurers. The employer's representative explained that he previously weighed the known premiums versus the risks and benefits and arrived at the conclusion that UM coverage was not worth the cost in any of its venues around the country. He set forth their rationales dealing with a large half million dollar deductible and the lack of any real benefitto the company from the coverage (as opposed to the benefit the company receives from liability coverage). Thus, unrebutted summary judgment evidence established that the employer was aware of the premiums at some *Page 12 
time prior to signing the rejection and had determined that it would always reject UM coverage.
 {¶ 42} As outlined earlier, an insurer need not make the offer each year when renewing a policy for an insured, but Liberty Mutual cannot rely on this statutory exception to mandatory offering because there was a three-year gap in coverage. See R.C. 3937.18(C). Although the exception cannot be relied upon by Liberty Mutual here to avoid the need for any offer at all, the existence of this statutory exception for renewals is somewhat relevant to our analysis. That is, the fact that premiums change over time was not considered to be significant by the legislature. Thus, the fact that Pike was aware of prior UM premiums instead of current premiums does not destroy Liberty Mutual's claim of a valid rejection, especially where a cost/benefit analysis was previously engaged in by Pike regarding this coverage and was maintained in subsequent years in all its multitude of insurance purchases.
 {¶ 43} Finally, we note that the Ninth District decided a case where the employer had two million in liability coverage and elected to purchase only $50,000 in UM coverage. Wilson v. Murch, 9th Dist. No. 05CA46, 2006-Ohio-1491. An employee claimed that since the written offer/rejection form failed to state the premium for two million dollars worth of coverage, such limits arose by operation of law. The employer's representative stated that they had selected the $50,000 limit in the past and decided to select it again and reject full coverage up to the limits of liability. He stated that although he was not orally advised of the premium for two million dollars worth of coverage, based upon his experience in purchasing insurance for the employer over the years, he had "a pretty good idea of the magnitude of the savings." The appellate court agreed that his "working knowledge" of the premiums' relationship and savings was sufficient. Id. at ¶ 16.
 {¶ 44} Pike's representative could be described as having more than "working knowledge" of the premiums and savings. He has prior knowledge of such element imparted to him from the insurer at issue herein. Pike specifically intended to reject coverage and had a substantial base of knowledge behind their decision including the input of a hired consultant who assisted them in receiving bids for their eighteen-state area of operation.
 {¶ 45} In conclusion, the failure to renew the knowledge after a three-year hiatus in coverage was not fatal to a valid rejection under the circumstances herein. *Page 13 
The extrinsic evidence sufficiently established the elements of a meaningful offer and thus a valid rejection here. Thus, UM coverage did not arise by operation of law.
 {¶ 46} Since there is no UM coverage, the other questions raised, regarding whether appellant was an insured and whether the $500,000 deductible applies to UM coverage that arises by operation of law, are moot.
 {¶ 47} For the foregoing reasons, the trial court's entry of summary judgment is hereby affirmed on the grounds that the insurer made a valid offer of UM coverage from which the employer made a knowing and timely rejection.
DeGenaro, P.J., concurs. Donofrio, J., concurs.
[1] We note that part of appellant's appeal concerning an umbrella insurer was previously dismissed by this court on the ground that a plaintiff cannot attempt to dismiss only his remaining claims against a defendant in order to make a partial summary judgment regarding that defendant final as the dismissal necessarily encompasses the entire suit as to that defendant. Peters v. Tipton (Aug. 2007 J.E.), 7th Dist. No. 07HA3, citing Denham, 86 Ohio St.3d at 596 and Latronica v. WesternSouthern Life, 7th Dist. No. 04MA227, 2005-Ohio-2935, ¶ 21-22. *Page 1